Case No. 20-35990

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

LANCE GORDON OCAMPO,

Plaintiff/Appellant,

v.

CORIZON L.L.C., Dianna Collins, Brian Crowl, Jim Dunning, Keith Bolin, Patti Schmitt,

Defendants/Appellees.

On appeal from the United States District Court for the District of Idaho
Case No. 1:18-cv-00047-DCN
Honorable David C. Nye

**APPELLANT'S OPENING BRIEF**

Howard A. Belodoff, ISB No. 2290
BELODOFF LAW OFFICE, PLLC
1004 W. Fort Street
Boise, ID 83702
P: (208) 331-3378
E: hbelodoff@hotmail.com

Rebecca A. Rainey, ISB No. 7527
RAINEY LAW OFFICE
P.O. Box 7726
Boise, ID 83707
P: (208) 417-3010
E: becky@raraineylaw.com

*Attorneys for Plaintiff/Appellant*

# Table of Contents

Table of Contents ............................................................................................ i

Table of Authorities ..................................................................................... iii

I. STATEMENT OF JURISDICTION ........................................................... 1

   A. STATUTORY BASIS OF SUBJECT MATTER JURISDICTION. ...................................... 1

   B. THE BASIS OF APPELLATE JURISDICTION. ........................................................... 1

   C. FILING DATES ESTABLISHING TIMELESS OF APPEAL. ........................................... 1

   D. ASSERTION APPEAL IS FROM A FINAL ORDER OR JUDGMENT. ............................. 1

II. ISSUES PRESENTED FOR REVIEW ........................................................ 1

   A. STANDARD OF REVIEW ....................................................................... 2

   III. STATEMENT OF THE CASE ....................................................... 3

      A. NATURE OF THE CASE AND COURSE OF PROCEEDINGS ................ 3

      B. DISPOSITION BELOW ....................................................................... 3

   IV. STATEMENT OF FACTS ........................................................... 3

   V. SUMMARY OF ARGUMENT ...................................................... 6

   VI. ARGUMENT ............................................................................ 6

      A.  Corizon had policies and customs creating *Monell* liability. ........................ 6

      B.  Corizon's Failure to provide qualified healthcare professionals to respond to Ocampo's pain and spreading infection was deliberately indifferent. .......... 13

      C.  The jury should determine whether Dunning was deliberately indifferent. 19

      D.  Ocampo's state law claims against Corizon should not have been dismissed ............................................................................................... 23

      E.  The jury should determine whether Bolin, Schmidt, and Collins were deliberately indifferent ................................................................................ 23

      F.  Collins' statements and Warden Carlin's memo are admissible .................. 30

      G.  The District Court erred by giving "little weight" to nurse Fabello's opinions ..................................................................................................... 32

      H.  Dr. Ludwig's opinions should be admitted. ............................................. 40

I. Dunning's unprofessional conduct was relevant to show *Monell* liability and deliberate indifference. ..................................................................42

J. There was a genuine issue of material fact of whether Crowl was grossly negligent or reckless under the Idaho Tort Claims Act....................................49

K. There was a genuine issue of material fact of whether Crowl was deliberately indifferent..................................................................53

L. The District Court abused its discretion by weighing the conversation between Ocampo, the officer and Crowl. ........................................................58

VII. CONCLUSION ..................................................................59

STATEMENT OF RELATED CASES............................................................60

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7) ..............................60

# Table of Authorities

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................2

*Block v. City of Los Angeles*, 253 F.3d 410 (9th Cir. 2001) ......................................31

*Boyd v. City and County of San Francisco*, 576 F.3d 938 (9th Cir. 2009). 44, 46, 47

*Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) ................ 7, 11, 18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................................31

*City of Canton v. Harris*, 489 U.S. 378 (1989)..........................................................8

*Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010)......................7

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311 (9th Cir. 1995). .....................38

*De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013)..................................................53

*Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) ...................................... passim

*Ellis v.* Corizon, Inc., 2018 WL 6268199 (D. Idaho Nov. 30, 2018) ............... 35, 41

*Estelle v. Gamble*, 429 U.S. 97 (1976) .....................................................................19

*Farber v. State*, 102 Idaho 398, 630 P.2d 685 (1981) ..............................................50

*Farmer v. Brennan*, 511 U.S. 825 (1994)............................................ 18, 40, 55, 57

*Fraser v. Goodale,* 342 F.3d 1032 (9th Cir. 2003)....................................................31

*General Elect. Co. v. Joiner*, 522 U.S. 136 (1997)...................................................37

*Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175 (9th Cir. 2002) .................... passim

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................................55

*Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982) ......................................................32

*Huddleston v. United States*, 485 U.S. 681 (1988)...................................................47

*Hudson v. McMillian*, 503 U.S. 1 (1992)..................................................................36

*Hunt v. Dental Dep't*, 865 F.2d 198 (9th Cir. 1989) .................................................19

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989)................................................8

*Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006) .................................................. 13, 36

*Keenan v. Price*, 68 Idaho 423, 195 P.2d 662 (1948)...............................................50

*Leslie v. Grupo ICA*, 198 F.3d 1152 (9th Cir. 1999).................................................2

*Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003)..................... 14, 39, 53, 54

*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).................................................. 14, 53

*Lytle v. Carl*, 382 F.3d 978 (9th Cir. 2004) ..........................................................7, 8

*Maljack Productions, Inc. v. Goodtimes Home Video Corp.*, 81 F.3d 881 (9th Cir. 1996) ...............................................................................................................30

*McGee v. Adams*, 721 F.3d 474 (7th Cir. 2013) .......................................................56

*McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1992)................................ 19, 36

*Mendiola-Martinez v. Arpaio*, 836 F.3d 1239 (9th Cir. 2016) ...............................11

*Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) ........................................6, 7

*Ollier v. Sweetwater Union High School*, 768 F.3d 843 (9th Cir. 2014) ...............38

*Orr v. Bank of Am., NT & SA*, 92 F.3d 973 (9th Cir. 2002) .......................................3

*Pauls v. Green*, 816 F.Supp.2d 961 (D. Idaho 2011) ................................................42

*Pembaur v. Cincinnati*, 475 U.S. 469 (9th Cir. 1986) ...............................................7

*Peralta v. Dillard*, 681 F.3d 978 (9th Cir. 2014).....................................................56

*Primiano v. Cook,* 598 F.3d 558 (9th Cir. 2010)................................................ 37, 40

*Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061 (9th Cir. 2002) .............................2

*Rodriguez v. County of Los Angeles*, 891 F.3d 776 (2018) ........................... 7, 8, 43

*Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015) ..................................................19

*S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921 (9th Cir. 2014) .................................31

*S. Griffin Const., Inc. v. City of Lewiston*, 135 Idaho 181, 16 P.3d 278 (2000)......50

*Sanders v. York*, 446 F.App'x 40 (9th Cir. 2011)....................................................35

*Sandoval v. County of San Diego*, 985 F.3d 657 (2021) ......................................3, 31

*Sanzo v. Cox*, 2015 WL 9598270 (D. Nevada December 10, 2015) ........................58

*Scott and Fetzer Co. v. Dile*, 643 F.2d 670 (1981)..................................................42

*Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012)...................................... 23, 56, 58

*Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996)..........................................................8

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012).....................................6

*U.S. v. Sandoval-Mendoza*, 472 F.3d 645 (2006).................................................3, 40

*United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014) ............................................37

*Velazquez v. City of Long Beach*, 793 F.3d 1010 (9th Cir. 2015) ............................8

*Webb v. Sloan*, 330 F.3d 1158 (9th Cir.2003) ..........................................................9

*Whitley v. Albers*, 475 U.S. 312 (1986) ..................................................................14

*Wilk v. Neven*, 956 F.3d 1143 (9th Cir. 2020) ........................................................57

*WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).........................19

*Zetwick v. Cty. of Yolo*, 850 F.3d 436 (9th Cir. 2017) ..............................................2

**Statutes**

28 U.S.C. § 1291 .........................................................................................................1

28 U.S.C. § 1331 .........................................................................................................1

28 U.S.C. § 1343(3) .....................................................................................................1

28 U.S.C. § 1343(4) .....................................................................................................1

I.C. § 54-1804(2) ........................................................................................10

I.C. § 6-904B(5) ................................................................................. 49, 50

I.C. § 6-904C(1) ................................................................................. 49, 50

I.C. § 6-904C(2) ................................................................................. 49, 50

**Rules**

F.R.C.P. 26(b)(4) .......................................................................................42

F.R.C.P. 26(e) ...........................................................................................42

F.R.C.P. 37(c)(1) .......................................................................................42

F.R.C.P. 56(c) ...........................................................................................2

F.R.C.P. 56(c)(2) ................................................................................. 30, 31

F.R.E. 401 ...............................................................................................44

F.R.E. 402 ...............................................................................................44

F.R.E. 403 ......................................................................................... 44, 45

F.R.E. 404 ...............................................................................................44

F.R.E. 404(b)(1) .......................................................................................47

F.R.E. 702 ......................................................................................... 37, 38

F.R.E. 801(d)(2) ................................................................................. 31, 32

F.R.E. 801(d)(2)(A) ...................................................................................32

F.R.E. 801(d)(2)(C) ...................................................................................32

F.R.E. 801(d)(2)(D) ........................................................................... 32, 58

F.R.E. 803(6) ...........................................................................................32

# I. STATEMENT OF JURISDICTION

A. STATUTORY BASIS OF SUBJECT MATTER JURISDICTION.

The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(3) & (4).

B. THE BASIS OF APPELLATE JURISDICTION.

Appellate jurisdiction is under 28 U.S.C. § 1291 for final decisions of the district courts.

C. FILING DATES ESTABLISHING TIMELESS OF APPEAL.

The District Court issued its Memorandum Decision and Order and Judgment on October 21, 2020, dismissing the case. 1-ER-003. Plaintiff filed a Notice of Appeal on November 15, 2020. 4-ER-880.

D. ASSERTION APPEAL IS FROM A FINAL ORDER OR JUDGMENT.

The appeal is from a final Judgment and Order granting summary judgment. 1-ER-002.

# II. ISSUES PRESENTED FOR REVIEW

Whether the Court erred by ruling on summary judgment Corizon was not subject to *Monell* liability and the individual Defendants were not deliberately indifferent to Ocampo's serious medical needs.

Whether the Court erred by weighing and excluding Ocampo's experts' opinions and ruling character evidence was inadmissible, and excluding evidence on summary judgment based upon its form.

**A. STANDARD OF REVIEW**

A district court's decision to grant summary judgment is reviewed de novo. *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1064 (9th Cir. 2002) (en banc). The Court's "review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). [It] must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* at 1064-65 (citations omitted). The Court does not "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may not "disregard direct evidence on the ground that no reasonable jury would believe it." *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). "We review the district court's decision to exclude expert witness

testimony for abuse of discretion." *U.S. v. Sandoval-Mendoza*, 472 F.3d 645, 652 (2006). "We review the district court's construction of the hearsay rule do novo." *Orr v. Bank of Am., NT & SA*, 92 F.3d 973, 788 (9th Cir. 2002). Evidentiary rulings are reviewed for an abuse of discretion. *Sandoval v. County of San Diego*, 985 F.3d 657 (2021).

### III. STATEMENT OF THE CASE

A. NATURE OF THE CASE AND COURSE OF PROCEEDINGS

Ocampo contends Defendants were deliberately indifferent to his serious medical needs under the Eighth Amendment and state law.

B. DISPOSITION BELOW

The District Court granted summary judgment and dismissed Ocampo's Eighth Amendment claims finding no *Monell* liability and deliberate indifference and his state law claims.

### IV. STATEMENT OF FACTS

On April 28, 2016, Lance Ocampo ("Ocampo") had a wisdom tooth extracted by Corizon's dentist at the minimum custody North Idaho Correctional Institution ("NICI"). On April 30th Ocampo filled out a Health Services Request ("HSR") complaining "My missing tooth is infected I think. Lots of pain!!!". A Correctional Medical Specialist ("CMS") examined him and gave him only Ibuprofen for the pain. On May 1st Ocampo submitted a second HSR complaining

APPELLANT'S BRIEF – Page 3

"My throat hurts My mouth hurts, can't sleep, can't eat, can't swallow, can't open mouth. PAIN." Despite Ocampo not being able to open his mouth and having lots of distress, CMS Dunning ("Dunning") unlawfully diagnosed strep throat. Dunning unlawfully prescribed an antibiotic. Ocampo's housing officer called Dunning to report Ocampo needed to go to the ER. Dunning reexamined Ocampo, noted slight swelling on his face, but did not call a doctor. Though Ocampo told Dunning he was in pain and could not eat or sleep, Dunning took away Ocampo's Ibuprofen and told him to "cowboy up".

On May 2nd Ocampo submitted a third HSR complaining of "Pain! Pain! Pain! Pain! And more swelling, no sleep, no food. Please help me!!!!" LPN Schmidt ("Schmidt") called the dentist who, without an examination, ordered additional antibiotics and an injection. Later, Ocampo told an Officer he was in pain, thought he was dying, and needed to go to the hospital. The Officer telephoned the Lieutenant Crowl ("Crowl") to inform him of Ocampo's condition and request to go to the hospital. Crowl told Ocampo to go back to his bunk but did not contact medical. At 1900 hours Supervising Nurse Shriver ("Shriver") noted the "slight swelling" recorded by Dunning 35 hours earlier now extended from Ocampo's eye to chin. Eighty minutes later CMS Bolin ('Bolin") checked on Ocampo and noted his temperature was 100.3 and blood pressure had soared to 145/79. Bolin requested officers check on Ocampo and left.

On May 3rd at 520 hours Schmidt recorded Ocampo's swelling was full and down in the lower neck and throat area but did not contact a doctor or dentist. Ocampo spoke with his counselor who wrote a report stating the swelling had spread over Ocampo's face into his chest and increased from the size of a baseball to softball. Ocampo returned to medical before noon as Schmidt examined him, Shriver observed his facial swelling from down the hallway. Shriver called Nurse Practitioner Collins ("Collins"), who worked at NICI only one day a week, to get permission to send Ocampo to the hospital two miles away. Collins refused to order a transport and requested Shriver text her a photo of Ocampo's face. Shriver took the photo but had to drive out of the prison for cell reception. Collins did not call back for 45 minutes so Shriver called her to authorized transport.

A CT scan revealed a massive abscess of the right oral airway and space and the ER doctor diagnosed Ocampo with Ludwig's Angina. An ambulance immediately transported Ocampo to another hospital for emergency surgery. Ocampo was unconscious in the ICU for several days and remained hospitalized for seven. Ocampo's recovery took several months, and he suffered permanent injury.

Prior to being transported to the hospital, Ocampo suffered in pain for four days, unable to eat or sleep, while the growing infection failed to respond to any medications. CMSs and LPNs are not trained or licensed to diagnosis or treat.

APPELLANT'S BRIEF – Page 5

These individuals never contacted Collins or other qualified healthcare professionals who were licensed to diagnose and treat. Licensed professionals could have recognized the severity of Ocampo's life-threatening infection. Corizon and prison policies required prisoners suffering pain, swelling, and infection receive emergency care and be seen by a qualified healthcare professional.

## V. SUMMARY OF ARGUMENT

The District Court erred in determining Corizon had no *Monell* liability and the individual Defendants were not deliberately indifferent and grossly negligent under state law by delaying medical care for Ocampo's painful and obvious serious medical need. The Court improperly weighed the evidence and made creditability determinations rather than letting the jury decide genuine issues of disputed fact. The Court improperly excluded expert opinions and admissible evidence.

## VI. ARGUMENT

### A. Corizon's policies and customs created *Monell* liability.

The Court held Corizon did not have a policy or custom required for entity liability under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), and was not deliberately indifferent to Ocampo's serious medical need. 1-ER-028-29. A private entity is liable if policies or customs cause constitutional violations. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012). The Court's *Monell* analysis erred by employing a subjective standard for deliberate indifference

requiring that Corizon "'knows of and disregards an excessive risk to inmate health and safety.'" 1-ER-028 (quoting *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002)). *Monell* liability requires an objective standard because, unlike persons, entities do not have a state of mind. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc).

*Monell* liability is established three different ways. First, if the "'execution of a [Corizon's] policy or custom, whether made by its [policy makers] or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury.'" *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 802 (9th 2018) (quoting *Monell*, 436 U.S. at 694). Under *Monell*, policy includes "a rule or practice applicable in many situations. It also includes 'a course of action tailored to a particular situation and not intended to control decisions in later situations.'" *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 481(1986)). Policies can provide notice that failure to follow such policy poses a serious risk of harm. *Castro*, 833 F.3d at 1077. Second, acts of omission as well as commission can establish *Monell* liability. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). Corizon's failure to train employees can be deliberately indifferent when "'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of [Corizon] can reasonably be said to

have been deliberately indifferent to the need.'" *Rodriguez*, 891 F.3d at 802 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). A "plaintiff may prove the second type of *Monell* liability, deliberate indifference, through evidence of a failure to investigate and discipline employees in the face of widespread constitutional violations." *Id.* at 803 (citations omitted). Third, if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 802-03 (cleaned up). (citing *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027–28 (9th Cir. 2015)).

The Court considered only whether Corizon had an "unwritten policy or custom" . . . so "'persistent and widespread'" that it was a "'permanent'" practice. 1-ER-029. The Court failed to consider whether Corizon had delegated its final policy making authority to medical staff. *See Lytle*, 382 F.3d at 982 ("'Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue....'") (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). The Court rejected all evidence of an "improper custom" holding it was based upon "isolated or sporadic incidents" and the practice was not "a traditional method of carrying out policy." 1-ER-029 (citing *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)). *Monell* liability can be established "for an

isolated constitutional violation when the person causing the violation has final policymaking authority." *Lytle*, 382 F.3d at 983 (cleaned up) (citing *Webb v. Sloan*, 330 F.3d 1158, 1167 n. 6 (9th Cir.2003)) (deputy attorneys were policymakers when "any deputy in the office could have made the decision to dismiss the charges against the Plaintiff without consulting any supervisor"). In *Trevino* the city council did not have an unconstitutional policy and never voted to pay punitive damage judgments against officers in prior cases. *Trevino*, 99 F.3d at 918-19. The Court held "the question of whether a policy or custom exists would be a jury question." *Id.* at 920.

The Court failed to consider if Corizon's policies or the failure to follow policies posed a serious risk of harm or whether a policy of omission amounted to a failure to protect constitutional rights. The Court failed to consider whether Corizon's medical staff's lack of training resulted in deliberate indifference or whether Corizon ratified unconstitutional conduct by failing to discipline its employees because it excluded evidence of failures to comply with policies and not providing medical care to inmates. Ocampo presented evidence that he suffered pain, swelling, and infection because of Corizon's deliberately indifferent policies and customs of providing unqualified and unsupervised healthcare professionals, who were not licensed to assess, diagnosis, or treat his obvious infection, while it grew from the size of a baseball to softball and extended from his eye socket down

his neck to his lower throat, due to delays over four days and the use of ineffective pain medication and antibiotics, resulting in emergency surgery and seven days of hospitalization.

Corizon authorizes CMSs and LPNs to exceed their scope of practice and licensure to practice medicine unsupervised by qualified healthcare professionals in violation of Corizon and IDOC policies and state law. Ocampo submitted evidence that Corizon had actual notice its omissions would result in a substantial risk of serious harm and constitutional violations because other prisoners had experienced pain, swelling and infections after tooth extractions resulting in hospitalizations after not being diagnosed and transported for treatment. Corizon condoned Dunning's, Bolin's, and Schmidt's violations of its policies by failing to discipline them.

Instead of accepting as true Ocampo's evidence and expert's opinions, the Court weighed the evidence and characterized it as "based upon opinions of what is correct and/or rely on misunderstandings of Corizon's policies." 1-ER-029. The Court held, while CMSs were not licensed and only allowed to practice under a physician's supervision, Corizon's policies allowed CMSs "to provide inmates with medical care" in violation of Idaho Code § 54-1804(2) which makes it a felony to practice medicine without a license. 1-ER-029-030. The Court accepted as true, Corizon's nursing expert's opinion that Ocampo's "normal" vital signs

explained "the course of treatment" provided despite his continuing pain, increasing swelling, inability to eat or sleep, and the antibiotic's failure to halt his worsening infection.

Corizon's Policy required "[c]linical decisions" of prisoners "to meet their serious medical . . . needs are the sole responsibility of qualified health care professionals." 2-ER-216. Corizon's policy was to use unlicensed staff without the supervision of qualified healthcare professionals which included "'physicians, physician assistants, nurses, nurse practitioners, dentists, . . . who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for patients.'" 1-ER-030. Corizon policies authorized unqualified and unsupervised CMSs and LPNs to assess, diagnosis, and treat serious medical conditions. These policies delayed treatment and created a substantial risk of harm. *Gibson*, 290 F.3d at 1191 (a mental health screening policy provided notice that failure to screen could lead to serious harm); *See also Castro*, 833 F.3d at 1077 (building codes requiring 'sound-actuated audio monitoring systems' provided notice that the failure to monitor a sobering cell could lead to serious risk of harm); *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1248 (9th Cir. 2016) (policy prohibiting shackling of women in labor provided notice of substantial risk of harm inherent in the practice).

Corizon's policies mandate a qualified healthcare professional triage dental requests daily to give prisoners "access for urgent or painful conditions." 2-ER-22; 2-ER-252; 2-ER-257. Idaho Department of Correction's ("IDOC's") policy requires Corizon provide immediate "emergency dental treatment" for "pain, infection, jaw and facial swelling." 2-ER-257-58. The National Commission on Correctional Health Care ("NCCHC") requires "[o]ral care is timely and it includes immediate access for urgent and painful conditions." 2-ER-233-34(P-E-06). Corizion's policy required that if "seen twice in sick call for the same complaints," prisoners be seen by nurse practitioners or doctors. 2-ER-283(42:1-22). Under *Monell*, Corizon's policies provided notice that failure to provide emergency dental care or to otherwise make referrals to qualified healthcare professionals to meet serious medical needs could result in a substantial risk of harm. Corizon is subject to *Monell* liability because, in spite of its policies to the contrary, it authorized Dunning, Bolin, and Schmitt to unlawfully diagnose and treat Ocampo's serious medical needs. Corizion's customs and practices of authorizing CMSs and LPNs to make diagnostic and treatment decision beyond their scope of practices and licensure support *Monell* liability.

Corizon did not discipline Dunning, Schmitt, or Bolin for diagnosing and treating Ocampo, which exceed their scope of practice and licensure, for not using Nurse Encounter Tools ("NETs"), for not contacting Collins, the "on-call

APPELLANT'S BRIEF – Page 12

provider," or Dr. Bunt, or their failure to follow Corizon policies. 4-ER-646(65:18-25). Corizon did not discipline Dunning even though Health Services Administrator ("HSA") Palazzo informed Corizon's Director of Operations that "Jim should have had either Dr. Schaff or Diana, come in to see the patient earlier." 3-ER-402. Collins admitted she was not called very often. 4-ER-647(66:10-16). Collins discussed her concerns about Ocampo's care with Palazzo, her supervisor. 2-ER-334 & 4-ER-655(27:2-12). While knowing of other cases where "nurses waited to take action on significant clinical findings", Palazzo minimized any issues with Ocampo's care. 3-ER-398 & 2-ER-344. Palazzo told Collins Dunning would not be disciplined because Corizon "needed a warm body." 4-ER-658(125:8-21). Collins was unaware of any changes in policy after what happened to Ocampo. 4-ER-647(68:2-22). A jury could conclude these practices and the lack of discipline constitutes ratification under *Monell*.

**B. Corizon's Failure to provide qualified healthcare professionals to respond to Ocampo's pain and spreading infection was deliberately indifferent.**

Evidence of deliberate indifference includes: (1) a purposeful act or failure to respond to pain or medical need and (2) the harm caused the indifference. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* A

finding of "an express intent to inflict unnecessary pain is not required." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). When a prisoner makes explicit requests for medical care and has an "obviously sickly appearance" a jury could easily find that an officer "consciously disregarded a serious risk." *Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003). "The provision of some medical treatment, even extensive treatment over a period of years, does not immunize officials from the Eighth Amendment's requirements." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 793 (9th Cir. 2019), *cert. denied* __U.S.__, 2020 WL 6037411(U.S. Oct. 13, 2020) (citing and quoting *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000)) (en banc) ("explaining that '[a] prisoner need not prove that he was completely denied medical care' to make out an Eighth Amendment claim.").

NCCHC accreditation required a nurse practitioner's presence five days a week and all "[clinical judgments rest with a designated responsible physician, who is on site once a week." 2-ER-231 and 2-ER-227(P-C-07 & P-A-02). Corizon's policy had Collins present at NICI on Wednesdays to supervise the CMSs and LPNs. 2-ER-247 & 2-ER-243(15:14-18). A dentist came in once a week. *Id.* The doctor came in twice a month. *Id.* Ocampo went to sick call at least seven times from April 30th to May 3rd but was evaluated by only by unlicensed CMSs and LPNs, never examined by Collins or a doctor.

Corizon's policy has CMSs perform routine duties such as recording vital signs and health history, it does not allow unlicensed employees "examine, diagnosis, and treat patients . . . ." 2-ER-269. A CMS only needs a high school diploma and on the job training. 2-ER-269-70. A physician has to actively and continuously review a CMS's clinical performance and documentation but does not have to be present. *Id.* CMSs cannot "perform duties under the direct delegation supervision or supervision of nursing personal." 2-ER-271. CMSs cannot make diagnoses. 2-ER-285(51:12-13). Shriver testified "CMSs can perform any tasks assigned that the supervising physician has signed off on." 2-ER-285(52:3-6). The scope of practice governs the CMS's assigned tasks. 2-ER-276 & 2-ER-285(53:2-8). Shriver could not recall the doctor "doing any kind of review to determine if the CMSs were confirming their duties within the scope of practice that he signed off on." 2-ER-285(53:17-21. Shriver does not conduct sick call and does not review medical files. 2-ER-288(82:12-18).

Direct evidence shows Corizon's policy of allowing unqualified healthcare professionals to evaluate, diagnose, and treat serious medical conditions. Shriver testified a prisoner completes a HSR and is seen at sick call at 7:00 AM unless security or the shift commander asks for him to be seen. 2-ER-284(48:5-49:10). A daily pill call is at 5:00 AM and 5:00 PM. 2-ER-284(49:12-25). The CMSs and LPNs use a NET that correlates to the chief complaint to determine whether to call

the doctor or whether a "nursing intervention" is appropriate. 4-ER-682(41:9-25). Corizion's policy is to use NETS if "appropriate to the level of competency" of the nursing personnel in compliance with state law. 2-ER-262. Corizon's policy provides NETs are used to identify and care for aliments with over-the-counter medications and "[t]hey provide a sequence of steps taken to evaluate and stabilize the patient until a clinician is contacted and orders are received for further care." *Id.* "Nursing protocols do not include the use of prescription medications." 2-ER-263. CMS's scope of practice does not include using NETs. 2-ER-276.

Dunning improperly used a NET and Bolin and Schmitt failed to use NETs to assess Ocampo and disregarded policies requiring Ocampo be evaluated by a qualified healthcare professional, and to be provided emergency care for his pain, swelling, and infection, resulting in delays and evidences a substantial risk of harm and deliberate indifference. Corizon authorized untrained and unsupervised CMSs and LPNs to exceed their licensure and scopes of practice by diagnosing and treating Ocampo's serious medical needs. This constitutes deliberate indifference.

Corizon had notice of other cases where delays in the diagnosis and treatment of post-extraction infections resulted where "the nurses waited to take action on significant clinical findings." 2-ER-298-99(157:25-158:16). Connie Smock, Corizon's Regional Director of Nursing for eleven years, was aware of three prior cases where inmates suffered significant post-extraction infections and

had to be sent to the emergency room. 4-ER-695(7:14-25) & 2-ER-344 In November 2016 Corizon's Regional Medical Director requested Shriver to send her the dental files where prisoners at NICI had suffered an infection after a tooth extraction. 2-ER-348-49. Dental infections were so widespread that Dr. Eaton, Corizon Regional Medical Director, saw the need for training and implementing an emergency dental protocol for medical and dental staff. 2-ER-346.

In June 2018, a prisoner suffered post-extraction pain, swelling, and infection that was not evaluated by qualified healthcare professionals. 3-ER-422 at ¶12. She made numerous requests for medical care but was not evaluated by a dentist or physician. 3-ER-423 at ¶20. The pain became worse and the swelling went down her neck to her collar bone until she looked like a "monster." 3-ER-423 at ¶s 23-24. The officers notified Corizon's staff but she was not evaluated because of normal vital signs. 3-ER-423 at ¶26. She waited four days before she was taken to medical and was told the nurse practitioner had authority to transfer her to the hospital. 3-ER-424 at ¶s 28-30. She waited an hour and half for the practitioner to order her transport to the hospital. 3-ER-424 at ¶s 31-32. She was diagnosed with Ludwig's Angina and taken into surgery. 3-ER-424 at ¶35. After six days of unsuccessful treatment she was life flighted to the University of Utah Hospital and, after undergoing extensive surgery, was shackled to her bed for seven days. 3-ER-424 at ¶s 37-44.

This evidence and expert opinion created a genuine issue of fact of whether Corizon had customs and policies of delaying care by qualified healthcare professional which posed a substantial risk of harm to Ocampo. *See* 4-ER-799. A jury could conclude Corizon's policy to use unqualified and unsupervised CMSs and LPNs to assess and diagnosis prisoners both posed a substantial risk of serious harm and caused Ocampo serious harm. "[I]t does not matter ... whether a prisoner faces an excessive risk ... for reasons personal to him or because all prisoners in his situation face such a risk" *Farmer v. Brennan*, 511 U.S. 825, 843–44 (1994). Corizon's policies acknowledged substantial risks of harm by allowing unqualified and unsupervised CMSs and LPNs to diagnosis prisoners which resulted in Ocampo suffering unnecessary pain as the infection worsen over four days. Corizon's customs or policies were the moving force for its deliberate indifference. *Castro*, 833 F.3d at 1076-77. "[A] plethora of circumstantial evidence could lead a reasonable jury to infer that [Corizon] was aware of the risk that its policies presented." *Gibson*, 290 F.3d at 1190. "Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Gibson*, 290 F.3d at 1194-95 (citations omitted). A jury could conclude qualified healthcare professionals could have evaluated and diagnosed Ludwig Angina and transported Ocampo to a hospital without delay and him suffering unnecessary pain and injury.

Corizon's policy of continuing to rely upon unqualified CMSs and LPNs and its policy of "normal vital signs" to delay medical care for pain, swelling and infections after tooth extractions, causing at least seven prisoners to suffer extreme pain and permanent injuries "is incompatible with the concept of human dignity and has no place in civilized society." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems." *Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (citations omitted). In deciding deliberate indifference the court need not defer to the judgment of prison doctors or administrators. *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). The failure or delay in providing medical care "is not the type of routine discomfort [that] is 'part of the penalty that a criminal offenders pay for offenses to society." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (partially overruled on other grounds *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)) (cleaned up). This Court should reverse the summary judgment on *Monell* and deliberate indifference.

## C. The jury should determine whether Dunning was deliberately indifferent.

On March 3, 2016, Ocampo's Prison Screening recorded a pulse of 62, blood pressure of 104/66 and no O2 level. 4-ER-727. On April 28th Ocampo's wisdom tooth was extracted by Dr. Schaff, the NICI dentist. 1-ER-004. On April 30th Ocampo completed an HSR stating "my missing tooth is infected I think. Lots

of pain!!!" 4-ER-730. CMS Gentry did not complete the "Health Care Documentation" on the HSR. Gentry filled out a "NET Dental" recording a temperature of 98.8 and blood pressure of 130/84. Gentry indicated Ocampo's pain was aching, throbbing and was 6 on a scale of 10, swelling, and "pain upon opening jaw widely." 4-ER-736. Gentry referred Ocampo to the dentist and provided Ibuprofen. Gentry disregarded Corizon's policy that a patient presenting with dental pain would be seen that same day by a practitioner.

On May 1st Ocampo submitted an HSR stating: "My throat hurts My mouth hurts, can't sleep, can't eat, can't swallow, can't open mouth. PAIN." 4-ER-731. At 8:00 hours Dunning failed to complete the "Health Care Documentation" and referred him to the "Nurse/Corizon." *Id.* Dunning completed the NET for Upper Respiratory Symptoms (Asthma, Influenza and Upper Respiratory). 4-ER-738. Dunning recorded Ocampo's temperature as 97.7.8 and blood pressure of 136/88. *Id.* Dunning recorded "unable to assess. Could not open mouth. Pt in lots of distress." *Id.* Dunning's use of "distress" meant "a lot of pain." 2-ER-308. At 9:50 hours Officer Turner's Unit Log indicated: Ocampo . . . came to office complaining of pain and difficulty swallowing. Medical notified and advised to have him lay down and come to medical at 1200." 2-ER-311. Dunning later admitted the "officer sent over – something going on need to go to the ER Now." 2-ER-301.

Dunning recorded: "Follow up noon" "T 97.7" 4-ER-739. Dunning prescribed penicillin "PEN V-K." *Id.* Ocampo asked Dunning "for a clear liquid diet because his jaw was locked." 2-ER-313. Dunning told Ocampo to "cowboy up and eat what he could off the tray." *Id.* Dunning checked the NET "Nurse follow up scheduled" and noted "patient states throat very painful unable to swallow & open mouth slight swelling visible R side of face." *Id.* There was no evidence Dunning's diagnosis was supervised by the physician or he scheduled a nurse follow up. Contract Monitor, Nurse Cardona ("Cardona") told Dunning and Shriver when an inmate cannot "open his mouth" it may be "an indicator for emergent care." *Id.* Cardona told Corizon's HSA Palazzo that Dunning's note "Unable to assess could not open month. PT in lots of distress" "gives the impression that the inmate may have been in need of seeing a provider (Doctor or PA) at this time." 3-ER-400. Dunning would later admit "Don't question and I would treat it as an emergency next time" and "I will send a patient to the ER next time." 2-ER-308.

Dunning was not qualified or licensed to diagnosis or prescribe PEN V-K. He had no training to evaluate Ocampo's condition and he deliberately exceeded his scope of practice to diagnose and proscribe antibiotics for strep throat. 2-ER-276. An Idaho statute that licenses CMSs with a high school education does not allow CMSs to commit a felony by practicing medicine and does not meet the

Eight Amendments requirements for providing medical care. Dunning's diagnosing and prescribing resulted from Corizon's policy of using unqualified and unsupervised CMSs instead of licensed medical professionals to evaluate and treat prisoners. Dunning was deliberately indifferent because his failure to have Ocampo evaluated by a qualified medical professional that could assess his pain, swelling and infection and his obvious emergent condition, as required by Corizon and IDOC policies, posed a substantial risk of serious harm. Corizon's and Dunning's deliberate indifference resulted in Ocampo suffering pain and the inability to eat while an aggressive and potentially life threatening infection spread.

The Court's determination "[a]t no time was it apparent that there was an emergent situation" nor "no indication that Ocampo was at a 'substantial risk of serious harm" was erroneous. 1-ER-032. Ocampo's housing officer called Dunning after determining he needed to go to the ER, Cardona told Dunning Ocampo's "distress" required intervention of a doctor and transport to the hospital, and Dunning's admission Ocampo required intervention of a doctor and transport to the hospital, establishes a jury could conclude qualified healthcare professionals could have diagnosed Ludwig Angina and transported him to a hospital sooner. Nurse Fabello supported Cardona's assessment that Ocampo's obvious condition caused him to suffer continuing pain and he needed transport to a hospital. 4-ER-796.

Instead, after being told he was in pain and could not eat, Dunning told Ocampo to "cowboy up." While the Court found "the comment was frankly appropriate" (1-ER-039), Palazzo issued a Correction Action finding Dunning's comment was unprofessional and could result in termination. 3-ER-363. A reasonable jury could find that Dunning's comment was textbook deliberate indifference. *See Snow v. McDaniel*, 681 F.3d 978, 990 (9th Cir. 2012) (finding physician assistant's statement: "…gonna let you suffer…" in response to inadequate pain medication is a "textbook example of the state of mind required to violate the Eight Amendment."). This Court should reverse the dismissal of Dunning. *See* 4-ER-797.

**D. Ocampo's state law claims against Corizon should not have been dismissed.**

The Court held not all diagnoses were correct and "providers were mistaken as to the extent of the infection" but assuming Ocampo was completely misdiagnosed there was no deliberate indifference for mere negligence. 1-ER-033. Ocampo's Amended Complaint alleged a state law negligence claim. 4-ER-858-60. The dismissal of Ocampo's state law claims against the Corizon Defendants that were not considered by the Court should be reversed.

**E. The jury should determine whether Bolin, Schmidt, and Collins were deliberately indifferent.**

The Court determined Bolin and Schmidt were not deliberately indifferent because there was no "'written protocol' mandating the use NETs." 1-ER-034. The Court found Bolin's limited task was to check on Ocampo. *Id.* The Court held Schmidt's failure to have the "full clinical picture'" prior to calling Dr. Schaff so he "might have recognized the Ludwig's Angina sooner," might have been a "possibility, it is just that: possible, not settled." 1-ER-035. The jury, not the Court, should decide facts and possible inferences. There was sufficient evidence for a jury to conclude Corizon's policies and individual actions posed a substantial risk of harm and constituted deliberate indifference.

On May 2nd Ocampo submitted a HSR stating: "PAIN! PAIN! Pain! More swelling No Sleep no food. Please help me!!!!" 4-ER-732. Schmidt saw Ocampo at 1415 hours but did not complete a NET or make Progress Notes regarding Ocampo's condition. *Id.* Other than temperature, Schmidt took no vitals. *Id.* She noted Dr. Schaff, without examining Ocampo, ordered antibiotic medication and injection, and made a dental appointment for "5-5-16." *Id.* Collins admitted that without an examination the severity of Ocampo's condition could not be determined. 2-ER-250 (102:24-103:5). Fabello agreed Ocampo should have been examined, not just evaluated over the phone. 4-ER-797. Ocampo was not provided effective medication for his "PAIN", swelling, or to help him to sleep and eat. Schmidt did not make a record of what she told Schaff.

On May 2nd at 1900 hours Shriver entered a Progress Note. 4-ER-744. Shriver recorded Ocampo's temperature had elevated to 99.3, his blood pressure was 110/70, and the "[right] side of face is edematous from the eye extending to the chin will continue to monitor." *Id.* The swelling was more severe than the "slight swelling visible on the [right] side face" noted by Dunning 35 hours earlier. 4-ER-739. Schmidt was deliberately indifferent when she failed to use a NET, violated IDOC's Dental policy and Corizon's policies and contractual obligation to provide emergency dental care within 24 hours for pain and infections, and failed to transport Ocampo to the ER. 2-ER-257 & 4-ER-609.

Eighty minutes later, at 2020 hours, Bolin recorded a Progress Note indicating: "No [change] in swelling" and Ocampo's temperature had increased to 100.3 and his blood pressure soared from 110/70 to145/79. 4-ER-744. Bolin "requested security check on him several times thru tonight" due to Ocampo's deteriorating condition. *Id.* There is no evidence of any security checks. Shriver's 1900 hours note contradicts her testimony that she did not examine Ocampo and her statement to investigators that she "did not see any swelling" until 1230 hours on May 3rd. 2-ER-286(72:4-5) & 3-ER-516. Bolin was deliberately indifferent by failing to contact Collins, or doctor and leaving, even though the Dental NET states an "Urgent Intervention-Contact Practitioner" was required if "Evidence of pus

APPELLANT'S BRIEF – Page 25

collection/swelling" were present and IDOC and Corizon polices required emergency dental care.

On May 3rd at 520 hours Schmidt's Progress Note recorded a temperature of 99.6 and blood pressure of 131/69. 4-ER-744. Schmidt recorded "swelling is full and down in the lower neck and throat area mainly Rt side and front. . . . continue [with] meds at this point." *Id.* Ocampo's infection was rapidly spreading down his neck, throat and face yet Schmidt continued antibiotic medications that obviously were not working. Schmidt was deliberately indifferent for not calling Collins or doctor as Ocampo's infection spread down his throat until it became life threatening.

The Court held because there was no policy mandating the use of NETs each time an inmate is seen or "the failure to do so is a violation of a Corizon policy." 1-ER-031. This is contradicted by Bolin and Schmidt previously received Correction Actions for not completing NETs for significate complaints and symptoms. 2-ER-315-16 & 2-ER-329-30. Shriver testified under Corizon's protocol a NET is used to determine whether care can be provided or they "need to contact the provider at the time." 2-ER-283(44:14-25). In her experience "a NET is always chosen." 2-ER-283(45:20-23). A NET is used each time an inmate is seen at sick call. 2-ER-284(46:2-11). The jury should determine whether Bolin and Schmidt were

deliberately indifferent for not using a NET to evaluate whether to contact Collins or the doctor. *See* 4-ER-797.

After Ocampo returned to his unit, Counselor Remacle reported Ocampo's deteriorating condition.

> Mr. Ocampo had a tooth removed last Thursday, while having a strep infection. Since that time, **Mr. Ocampo's condition has gotten worse. It went from a small baseball sized swelling, to a softball sized swelling that has spread to the décolletage area, and is not spreading down his throat and over into the other side of his face and into his chest area. He reports that is [sic] jaw is locked and he cannot eat and has not eaten since Saturday.** He had a banana on Saturday at 10:00. He reports losing 10 lbs. I am concerned about Mr. Ocampo's health.

2-ER-332. (emphasis added).

Ocampo returned to the clinic and was seen by Schmidt. While walking by, Shriver happened to notice the extreme swelling. 2-ER-288(83:4-24). Shriver determined Ocampo needed to go the ER, but first telephoned Collins to get permission. 2-ER-288(85:8-25-86:1-7). Shriver reported Ocampo's swelling was worse and recommended the ER. 2-ER-298 (87:1-5). Corizon's protocol required a physician to order the ER. 2-ER-289(89:3-7). Collins did not agree with Shriver's assessment and would not order a transport. 2-ER-289(89:8-10 &19-22). Collins requested a photo of Ocampo's swelling because "a picture is worth a thousand words." 2-ER-289(89:14-18) & 2-ER-334. Shriver drove out of the prison to text the photo. 2-ER-290 (90:16-25).

Shriver waited 30 to 45 minutes to get Collins's permission. 3-ER-516. Collins did not respond so Shriver called her back. 2-ER-290(91: 13-19). Shriver admitted she should have sent Ocampo sooner and not waited. *Id.* Shriver walked Ocampo to the gate and an officer drove him unrestrained to the hospital. 2-ER-290 (92:1-16). Shriver subsequently recorded a 1230 Progress Note noting "facial enena has increased, extending to neck and top of sternum." 4-ER-745 The time of 1230 hours was not contemporaneous because she wrote in the same note Collins ordered transport at 1310 hours. *Id.* Shriver described Ocampo's condition as "Retropharyngeal abscess w/ airway compromise." 4-ER-781. Collins was deliberately indifferent by not supervising untrained CMS's and LPN's care of prisoners with serious medical needs and allowing them to make diagnoses and treatment decisions instead of contacting her or a licensed qualified professional.

Ocampo was driven a couple of miles to St. Mary's Hospital's ER. 4-ER-650(105:19-25). Ocampo O2 Sat was 90% and a "CT showed a large abscess that was approximately 10 x 3 x 5 cm on the right side of his neck, extending down to the masticator space, deep into the zygomatic arch, down to the floor of the month and below the submandibular gland with this mass effect." 2-ER-340-41. The diagnosis was "Ludwig's angina with a massive abscess of the right oral airway and space." *Id.* The doctor ordered an ambulance to transfer Ocampo to another hospital for emergency surgery. 3-ER-636 at ¶s 47-48. Ocampo was unconscious

for two to three days and was in the ICU for most of his seven day hospitalization. 3-ER-636 at ¶s 49-50 & 4-ER-803-08. Ocampo's surgery and post-operative recovery was more extreme than if he had received timely and competent medical treatment. 2-ER-319-27. Ocampo continued to receive treatment for permanent injuries. 4-ER-803-08.

An investigation determined "several factors contributed to the delay in Mr. Ocampo going to the emergency room" including a "communication and teamwork breakdown between staff and PA [sic] Collins. There is also a perception that she is not easy to get a hold of when she is the on call provider." 3-ER-405. Shriver informed the investigators Dunning and Collins "do not have a good working relationship" because she would not timely call him back and when she did "the call did not go well." 3-ER-516. Smock recognized Dunning, Schmidt, and Bolin needed to notify Collins and seen by a provider. 2-ER-186. ("Did Diane get notified of this patient and did he get seen by a provider at any time during these few days?"). A jury could conclude these issues caused the delay in contacting Collins and Ocampo's transport to the ER. Collins delayed Ocampo going to the ER by requesting photographic evidence and not calling Shriver back consistent with her practice of not timely responding to medical staff. Shriver and Collins destroyed the photographic evidence. 2-ER-290(90:2-4) and 2-ER-

249(99:18-23). A jury could conclude they destroyed evidence of Ocampo's obvious severe condition to cover-up the deliberate indifference.

**F. Collins' statements and Warden Carlin's memo are admissible.**

The Court ruled a Memo prepared by Warden Carlin for Deputy Warden Anderson and Contract Monitor, Cardona, assigning them to conduct a "Medical Preliminary Inquiry" into Ocampo's medical care was hearsay because there was no foundation and it was unauthenticated. 1-ER-026-27. Corizon did not contest the authenticity of the Memo that Corizon produced in discovery. The Memo was discussed during the depositions of Anderson, Cardona and Shriver and Collins. 3-ER-519 and 3-ER-395. In *Maljack Productions, Inc. v. Goodtimes Home Video Corp.*, 81 F.3d 881, 889 n. 12 (9th Cir. 1996) this Court held documents produced in discovery did not require formal authentication if they bear signs of authenticity, such as being on letterhead, and if the opposing party does not contest their authenticity.

The Warden provided the Memo to Anderson and Cardona as part of their investigation. 4-ER-655 (26:1-11). Anderson and Cardona were assigned to investigate statements in the Memo by Collins, a party opponent and an agent of Corizon, a party opponent, and statements made to Collins by Palazzo, Corizon's agent. 4-ER-655(27:2-12) and 3-ER-400. They can testify at trial to foundation and authenticity of the Memo. Fed.R.Civ.P. 56(c)(2), provides the relevant standard for

APPELLANT'S BRIEF – Page 30

the admissibility of evidence at the summary judgment stage: "[a] party may object that the material cited to support or dispute **a fact cannot be presented in a form that would be admissible** in evidence." (emphasis added). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (An objection on summary judgment is misguided if the non-moving party can present the evidence in a form admissible at trial.)

This Court has reaffirmed the admissibility principles in Fed.R.Civ.P. 56(c)(2). In *Sandoval v. County of San Diego* the court excluded deputies' reports on an inmate's medical condition as inadmissible hearsay. *Id.*, 985 F.3d 657, 666 (9th Cir. 2021). The Court held the reports were admissible because "'[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.'" *Id.* (quoting *Fraser v. Goodale,* 342 F.3d 1032, 1036-37 (9th Cir. 2003)).[1] The Court observed "the objected-to documents either reflect the personal knowledge of individuals who could be called to testify at trial or will likely be admissible at trial under exceptions to the hearsay rule." *Id.* The Court held if the "reports recount statements made by the defendants in this case, they would be admissible as non-hearsay statements of a party opponent. *See* Fed. R. Evid. 801(d)(2)." *Id.*

---

[1] *See also Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir.2001) and *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925-26 (9th Cir. 2014).

Collins's statements to the Warden are not hearsay but admissions under Fed. R. Evid. 801(d)(2)(A) and (C). Fed.R.Evid. 801(d)(2)(D) makes a statement non-hearsay if it "is offered against a party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; . . ." Collins's statements were made while she was acting as a Corizon employee within the scope of her employment. Palazzo's statements to Collins were made while he was Corizon's employee in the scope of his relationship with Collins and Corizon. Rule 801(d)(2)(D) applies to statements within the scope of the agency. *Hoptowit v. Ray*, 682 F.2d 1237, 1262 (9th Cir. 1982). In *Hoptowit* an investigative report was ruled admissible *Id.* The Memo also qualifies as an exception to the hearsay rule for business records under Fed.R.Evid. 803(6). The Memo was prepared in the regular course of business as part of investigation into Ocampo's treatment. 4-ER-655(25:4-7). Collins and Palazzo were interviewed as part of the investigation. 3-ER-404. The Memo was not hearsay and was admissible on summary judgment.

## G. The District Court erred by giving "little weight" to nurse Fabello's opinions.

Cheryl Fabello is an Idaho Board Certified Registered Nurse with bachelor's and master's nursing degrees. 4-ER-790-91; 3-ER-463(48:4-8) and 3-ER-462(39:20-21). She was a Certified Clinical Nurse Leader. 3-ER-462(39:10-12). She works at the Idaho State Veteran's Home taking care of the country's heroes

and has treated patients under a variety of conditions. 1-ER-012; 3-ER-463(49:10-17); 4-ER-801. Fabello's education, experience and training qualified her to opine on Ocampo serious medical condition and the need to accurately document and timely communicate material changes in his condition to a physician or mid-level care provider. 3-ER-463(79:9-13); 4-ER-790-802. Fabello's opinions that Dunning, Bolin, Schmidt, and Collins failed and delayed providing medical care to Ocampo, causing him to endure unnecessary pain, and failed to meet nursing standards were relevant and could assist the jury.

Corizon argued Fabello was not qualified because she never worked in a prison and was not previously familiar with Ludwig's Angina. 1-ER-014. As a VA Charge Nurse, Febello reviewed prisoner medical records and was aware of the community and Corizon's standards of care. She cared for prisoners temporarily admitted to VA facilities. 3-ER-469(123:23-25; 124:4-9; and 125:1-8) and 4-ER-793. She consulted with correctional nurses about transfers to the VA. 3-ER-470(126:1-8). She worked with three RNs and LPNs who had previously worked in Idaho prisons. 3-ER-469(122:23-25; 123:1-2 & 7-19). They discussed "similarities between being at the correctional facility and working at our facility." 3-ER-470(126:17-25 & 127:1-3). She also relied on Collin's statement that "her staff was expected to treat people and their symptoms and their health issues as

though they were being seen outside of prison" while incarcerated. 3-ER-470-71 (129:19-130:1).

The NCCHC standards are guidelines and do not address the care and treatment of prisoners. 3-ER-496(27:7-22); 4-ER-665 (228:18-20 & 229:2-16). The NCCHC states correctional standards of care should be consistent community standards of care. 3-ER-451 ("health care for inmates is to be consistent with current community standards of care"). Fabello consulted with a professor of nursing at Lewis-Clark College to familiarize herself with the nursing standard of care at NICI. 3-ER-466(102:6-15 & 19-24). She verified there was no deviation in the standard of care between the nursing standards used at NICI and the standards Fabello used as a nurse. *Id.* Fabello also reviewed the depositions of Cardona, Collins, Shriver, and Defendants' experts' reports. 4-ER-812. The Court recognized Fabello's education and "extensive training" and her familiarity with the standard of care qualified her as an expert. 1-ER-015-16.

The Court found "whether any particular behavior was deliberate indifferent is to determine what the appropriate standard of care was and whether Defendants actions were reasonable" and "such analysis *must* take into account the fact that Ocampo's care took place in a correctional setting." 1-ER-015. (emphasis in original). The Court noted the "obvious considerations" in a "correctional setting" not present in the community which "must, nevertheless, be weighted when

determining" whether officials acted with deliberate indifference. *Id.* The Court found "Fabello has *no* training, experience, or education in correctional nursing—and did not consult with anyone who does—nor does she have any experience in diagnosing or treating Ludwig's Angina." (emphasis in original). Therefore this "lends itself to the conclusion that the Court should give it little weight when determining the motions today." 1-ER-016. The Court concluded Fabello's failure to—at a minimum—familiarize herself with the unique circumstances present in correctional nursing and how those conditions inform decisions made by medical professionals does little to "help the trier of fact [the Court in this instance] to understand the evidence or determine a fact in issue.'" 1-ER-017. The Court made no findings of how correctional conditions effected the decision not to transport Ocampo to the hospital or to consult with NICI's doctor or Collins. Since an expert is unnecessary to prove deliberate indifference it is illogical for the Court to hold Fabello to a higher standard. *See Ellis v.* Corizon, Inc., 2018 WL 6268199 at *3 (D. Idaho Nov. 30, 2018) (citing *Sanders v. York*, 446 F.App'x 40, 43 (9th Cir. 2011)).

The Court relied upon Corizon's expert's Gause's conclusory opinion that "correctional nursing is, simply put, 'nothing like community nursing'" and the correctional "'considerations which can drive the threshold for deciding to transfer a patient to the emergency department . . . .'" 1-ER-016. Gause' did not identify any "correctional" considerations that prevented Ocampo from being transported

APPELLANT'S BRIEF – Page 35

for emergency care. NICI is a minimal custody prison devoted to the "rider" program. 3-ER-428 at ¶ 4. The Court found Ocampo was "under less security than those housed at a traditional prison; inmates housing units are not restrictive and inmates are allowed to move about more freely in order to attend programing, work, medical appointments etc." 1-ER-004; 3-ER-428 at ¶ 7. Inmates reside in units monitored by one officer. 3-ER-428 at ¶ 5. Shriver walked Ocampo unshackled to the gate to be transported by one officer. 2-ER-290 (92:1-16). Gause was not qualified to offer opinions as a correctional expert.

Gause's conclusory opinions had no factual predicate or reliable methodology necessary for admissibility. Court's need not defer to the judgment of prison doctors or administrators. *Edmo*, 935 F.3d at 786. Medical providers cannot delay emergency care "for reasons unrelated to the medical needs of the prisoner." *Jett*, 439 F.3d at 1096. "'[T]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *Id.* at 1097 (quoting *McGuckin*, 974 F.2d at 1060) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)).

Gause was not qualified to testify about the standard of care at NICI. He only spoke with a Corizon Nurse Practitioner who practiced in Boise and did not have knowledge of the standard of care at NICI. 4-ER-710-11 at ¶ 6. The Practitioner confirmed the standard of care was the same as Boise. *Id.* Gause

worked in a jail with 6,000 inmates which is different than a minimum custody prison. 4-ER-710 at ¶ 4. Gause failed to identify any standards recognizing a correctional nursing specialty that was a product of reliable principles and methods; was tested, peer reviewed, published, and recognized by any medical professional, associations, or journals. 4-ER-719 at ¶ 33. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elect. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Gause's *ipse dixit* opinions failed to meet the requirements of Fed.R.Evid. 702. Corizon did not require Collins or Shriver to have correctional courses or training. 3-ER-435 (11:9-16; 12:5-8; & 13) and 3-ER-495 (23:12-15). Collins was unaware of any specialty for correctional healthcare. 3-ER-437 (31:7-23). Corizon provided no training specific to prisoners. 3-ER-497 (36:12-15).

An expert's methodology must be reliable and adequately explained; vague and generalized explanations are insufficient. *United States v. Vera*, 770 F.3d 1232, 1241 (9th Cir. 2014). "The test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology. . . ." *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010) (cleaned up). An expert's opinions are properly excluded when the court is only presented with an expert's qualifications,

conclusions, and assurances of reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995). The court's gatekeeping function requires more than simply "taking the expert's word for it.'" Advisory Committee Notes to the 2000 Amendments of Fed.R.Evid. 702 (quoting and citing *Daubert*, 43 F.3d at 1319). Expert opinions must be based on a systematic assessment, not personal opinion or qualifications. *Ollier v. Sweetwater Union High School*, 768 F.3d 843, 860 (9th Cir. 2014). The Court's decision failed to consider Fabello's opinions and accepted Gause's self-serving opinions without any preexisting research conducted independent of the litigation validating any correctional nursing standards. *Daubert*, 43 F.3d at 1317. Gause failed to "explain precisely how [he] went about reaching [his] conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like . . . ." *Id.* at 1319. In assessing whether expert testimony will assist the trier of fact the court must look to the governing substantive standard. *Id.* at 1320.

The Court found Fabello's lack of experience with Ludwig's Angina and the fact it was a "rare disease" called into question her conclusions. 1-ER-018. The Court misunderstood Fabello's testimony and the standard for deliberate indifference. Fabello has trained and supervised nurses in triage assessment and was qualified to testify the nurses should have notified the physician or sought

emergency care for Ocampo who, over four days, suffered pain and infection, facial swelling extending from the scalp and eye socket to below his jaw and in his neck, and was unable to eat. 4-ER-812-15. Ocampo was seen by CMSs and LPNs who were not licensed or trained to diagnosis or treat inmates. Fabello testified nurses are the gatekeepers between the patient and providers: "the eyes and ears" and "are authorized to send a person – call an ambulance or send a person to the emergency room. . . ." 3-ER-468 (115:15-25). The IDOC's dental policy required Ocampo be taken to a hospital if he experiences pain, swelling or infection. 3-ER-630-31; 3-ER-611-16 and 3-ER-631.

A jury could find Defendants "consciously disregarded a serious risk" to Ocampo's health due to his "obviously sickly appearance" and his pain, swelling and inability to eat or sleep whether or not Ludwig's Angina is "rare" condition. *See Lolli*, 351 F.3d at 421. An officer recognized Ocampo needed emergency treatment. The Officer told Dunning that "something going on need to go to the ER now." 2-ER-301. Dunning did not contact Collins or a doctor. Cardona instructed Dunning that if an inmate could "not open his mouth . . . this may have been an indicator for emergent care." 3-ER-601. Dunning admitted Ocampo's condition was "an emergency" and that "I will send a patient to the ER next time." 2-ER-308. The next day an Officer informed Crowl that Ocampo's "face is swollen very badly, and it's a lot worse than it was before and he's –he says he thinks he's

dying" and needed to go to the hospital. 3-ER-544 ¶s 18-19; 3-ER-547 ¶s 45-46. Remacle reported Ocampo's condition was obvious because the swelling increased from a "baseball size" to a "softball size" and spread to the décolletage area, and is now spreading down his throat and over into the other side of his face and into his chest area. . . ." 2-ER-313 and 2-ER-332. If untrained officers, a counselor, and Nurse Cardona recognized Ocampo obviously needed emergency care, then Corizon's medical staff should have acted not waited. *Farmer*, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Fabello was qualified to testify that Ocampo's symptoms required emergency transport. Under *Daubert*, the judge is "a gatekeeper, not a fact finder." *Primiano,* 598 F.3d at 564-65 (quoting *Sandoval–Mendoza*, 472 F.3d at 654. An expert who meets Rule 702 requirements may testify and "the jury decides how much weight to give that testimony." *Id.* at 565. "Where the foundation is sufficient, the litigant is 'entitled to have the jury decide upon [the experts'] credibility, rather than the judge.'" *Id.* at 566 (quoting *Sandoval–Mendoza*, 472 F.3d at 656). Fabello's expert opinions were admissible and, drawing all inferences in Ocampo's favor, were sufficient to defeat summary judgment and to allow a jury, not the Court or Corizon's expert, to weigh her opinions.

**H. Dr. Ludwig's opinions should be admitted.**

The Court found Dr. Ludwig's opinions disagreed with Corizon's expert's analysis of the care provided to Ocampo. 1-ER-019 n.8. Dr. Ludwig's opinions were not disclosed until after Corizon's expert reports. Dr. Ludwig's opinions should be admitted because Corizon failed to answer interrogatories on the facts related their expert's opinions and its Affirmative Defenses. *See* 3-ER-534-540 (Interrogatories Nos. 6 to 12). Corizon only disclosed the facts and opinions used by its expert after Ocampo's expert disclosure deadline. Ocampo was unable to determine the type of expert and opinions needed to challenge Corizon's defenses on summary judgment. The Court held Corizon's delay in answering "does not further the purposes of Rule 1 or heed general notions of fair play in litigation" however "it stands to reason" Corizon's experts would opine the care "was up to par." *Id.* The Court held Ocampo "should have—and in fact did—alert Ocampo . . . that he may need someone to rebut those conclusions." *Id.* The Court ruled Dr. Ludwig's opinions were not admissible on summary judgment. . . ." 1-ER-020 at n. 9.

In *Ellis v. Corizon, Inc.*, 2018 WL 6268199 *4 (D. Idaho Nov. 30, 2018), Ellis failed to disclose any experts until after the deadline. *Id.* at *1. The Court recognized courts "must determine whether the report should, nevertheless, be admitted as a case-in-chief expert report because the delay in disclosing the expert was 'substantially justified or . . . harmless.'" *Id.* at *5 n.7. Ellis did not argue the

late disclosure was substantially justified. *Id.* A late expert disclosure can be substantially justified if defendants fail to timely respond to discovery. *See Pauls v. Green*, 816 F.Supp.2d 961, 977 (D. Idaho 2011).

Ocampo's late expert disclosure was substantially justified under Fed.R.Civ.Proc. 37(c)(1) because of Corizon's failure to answer interrogatories regarding facts relied upon and its expert's opinions. 1-ER-019. Corizon never supplemented Ocampo's interrogatories until after Ocampo's expert disclosure deadline. Fed.R.Civ.Proc. 26(b)(4) provides a party may use discovery to identify facts the expert considered and relied on in forming opinions. Discovery is intended to make the "trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *Scott and Fetzer Co. v. Dile*, 643 F.2d 670, 674 (9th 1981) (cleaned up). Fed.R.Civ.Proc. 26(e) requires timely supplementation of interrogatories. Corizon's delay in answering discovery in violation of "the purposes of Rule 1" and "notions of fair play" substantially justified of Dr. Ludwig's late disclosure of his opinions on summary judgment and should be admitted.

**I. Dunning's unprofessional misconduct was relevant to show *Monell* liability and deliberate indifference.**

    1. <u>Dunning's unprofessional misconduct is relevant to Corizon's *Monell* liability.</u>

Dunning's unprofessional misconduct is relevant to Corizon's custom and practice of not providing qualified healthcare professionals to provide constitutionally adequate care. Corizon knew diagnosing and prescribing treatment was outside Dunning's scope of practice and its policies. 2-ER-197 at ¶ 8. Corizon's policy is to have LPNs and CMSs treat prisoners rather than a full-time nurse practitioner to increase its profits. Corizon's policies for oral care mandated "immediate access for urgent or painful conditions" and IDOC policies listed "pain, infection, jaw and facial swelling" as emergency conditions. 2-ER-195-96 at ¶ 4. Corizon's policies required a dentist and a doctor to be available for emergencies. *Id.* If an inmate went to sick call twice for the same condition, he should be referred to a provider. 2-ER-195 at ¶ 3. Corizon condoned Dunning's violation of policies and unprofessional misconduct because they needed "warm bodies." Corizon is subject to liability for its "failure to investigate and discipline employees in the face of widespread constitutional violations." *Rodriguez*, 891 F.3d at 803. *Supra* at 7. Dunning's history of misconduct and Corizon failure to take discipline action supports *Monell* liability. A jury could conclude Corizon's failure to respond to Dunning's unprofessional misconduct with Collins and with other inmates contributed to delays and failure to provide Ocampo with emergency medical care and constitutes ratification of Dunning's deliberate indifference.

> 2. <u>The relevance and probative value of Dunning's unprofessional misconduct substantially outweighed any prejudice.</u>

The Court denied admission of evidence, under Fed.R.Evid. 401, 402, 403, and 404, evidence of Dunning's unprofessional misconduct to establish the subjective component of deliberate indifference. 3-ER-351-90. The Court found Dunning's misconduct was not relevant.1-ER-042-043. The Court held, even if relevant, "the probative value of his past unprofessional acts is outweighed by the danger of unfair prejudice or misleading a jury." 1-ER-043. The Court found admitting "unprofessional" misconduct to "theorize how Dunning acted on May, 1, 2016" would allow the jury to "punish a person because of their respective character . . . ." *Id.*

To "show deliberate indifference, the plaintiff must show that the course of treatment the [official] chose was medically unacceptable under the circumstances and that the [official] chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Edmo*, 935 F.3d at 786 (citations omitted). "[E]vidence that may support one version of events over another is relevant and admissible." *Boyd v. City and County of San Francisco*, 576 F.3d 938, 943 (9th Cir. 2009). Dunning's unprofessional misconduct towards prisoners and officers is relevant to his diagnosing and prescribing medications to Ocampo. 3-ER-351-390. It is also relevant to Dunning's decision to not contact Collins because of his history of unprofessional misconduct towards Collins with no consequences.

Dunning's unprofessional misconduct shows Dunning acted with a culpable state of mind in conscious disregard for Ocampo's health when he told him to "cowboy up" and took away Ibuprofen even though Ocampo was experiencing pain, could not sleep, or eat. 4-ER-795. After Dunning "diagnosed" Ocampo's condition, an officer called Dunning because Ocampo obviously needed emergency treatment. The Officer told Dunning "something going on need to go to the ER now." 2-ER-301. Dunning examined Ocampo but did not contact Collins or a doctor. Cardona told Dunning if an inmate could "not open his mouth . . . this may have been an indicator for emergent care." 3-ER-601. To excuse his misconduct Dunning, after being confronted, was forced to admit he should have treated Ocampo condition "as an emergency", "I will send a patient to the ER next time," and that he "shouldn't have made that comment and can see how it was taken when you're in pain." 2-ER-308.

Fed.R.Evid. 403 balances whether the probative value of relevant evidence is "substantially outweighed" by the danger of unfair prejudice or misleading the jury. Dunning's unprofessional misconduct was relevant to Dunning's deliberate indifference. The fact other incidents of Dunning's unprofessional misconduct occurred does not determine if the probative value was "substantially outweighed" by unfair prejudice. "Proof that evidence was prejudicial to one party is insufficient to establish that the prejudice was unfair, or that the trial court abused its discretion

in weighing that prejudice against the evidence's probative value." *Boyd*, 576 F.3d at 948 (citation omitted).

Dunning's unprofessional conduct is relevant because Dunning contends when he told Ocampo to "cowboy up" he "did not intend the statement to be rude" and his expert asserted it was "a poor choice of words" but there is "no evidence it was made with a culpable state of mind or with any conscious disregard of an excessive risk to Plaintiff's health." 4-ER-834 ¶s 19-20; 4-ER-826; 4-ER-841-42 ¶ 15. The Court found Dunning's "cowboy up" comment was "a poor choice of words and a bit flamboyant" and "frankly appropriate." 1-ER-037. Ocampo is prejudiced by not having the ability to counter Dunning's explanations. The probative value "substantially outweighed" any prejudice by showing Dunning's culpable state of mind and conscious disregard of an excessive risk to the Ocampo's health since Dunning denies he did anything wrong. The Court can properly instruct the jury to avoid unfair prejudice.

   3. <u>Dunning's unprofessional misconduct was admissible to show Dunning's and Corizon's deliberate indifference.</u>

Ocampo sought to admit evidence relating to Dunning's interactions with Collins and his conversation with the Warden involving his treatment of a mentally ill inmate. 1-ER-044. The Court denied the admission finding "Dunning's past actions cannot be broadened to the point of assuming his state of mind on May 1, 2016" and did "not prove Ocampo's theories that it was Dunning's intent, motive,

or plan to deliberately ignore Ocampo's serious medical needs on May 1, 2016." 1-ER-045. Fed.R.Evid. 404(b)(1) provides that evidence of "a crime, wrong, or other act is not admissible to prove a person's character **in order to show that on a particular occasion the person acted in accordance with the character**." (emphasis in original). "The intent behind the rule is not to 'flatly prohibit the introduction of such evidence,' but to limit the purpose for which it may be introduced." *Boyd*, 576 F.3d at 947 (quoting *Huddleston v. United States*, 485 U.S. 681, 687 (1988)). The Rule allows the admission of character evidence for other purposes. "Rule 404(b) is a "**rule of inclusion** ... [; u]nless the evidence of other crimes tends **only to prove propensity**, it is admissible." *Boyd*, 576 F.3d at 947 (cleaned up) (emphasis in original). Dunning's history of unprofessional misconduct was not offered to prove Dunning's acted in accordance with his character but the intent and knowledge for establishing the subjective component of Dunning's and Corizon's deliberate indifference.

The Court should have admitted the Warden's Memo of May 5, 2016. 3-ER-394-96. *Supra* at 29-32. Collins told Warden Carlin she was "upset and very frustrated with the treatment that she had seen from the NICI staff." *Id.* She stated "it is very important to her that the offenders receive the same treatment as any person would that is in the community." *Id.* Collins told Warden Carlin that in December 2015 Dunning got mad and hung up on her. *Id.* & 2-ER-207 at ¶ 43.

APPELLANT'S BRIEF – Page 47

Dunning stated, "who the fuck does that bitch think she is, telling me how to do my job." *Id.* Collins reported the incident to Corizon but nothing was done about it. *Id.* Collins stated Dunning told Ocampo to "cowboy up" and "that he has a history of treating people poorly with no consequences." 3-ER-394-96. Collins reported HSA Palazzo told her "it's taken care of" and Dunning would remain on staff because "the medical department at NICI 'needed a warm body.'" *Id.* The Memo should have been admitted because Collins could be called to testify at trial about her conversations with the Warden and Palazzo. *Supra* at 29-32.

Dunning's unprofessional misconduct with Collins and prisoners is relevant to Ocampo's treatment. Corizon was aware Dunning's conflict with Collins prevented his supervision. 2-ER-207 at ¶ 43. Dunning's history of unprofessional interactions with prisoners and officers are relevant to the subjective component of deliberately indifference when Dunning told Ocampo to "cowboy up" and why Dunning did not consult with Collins or a doctor to examine, diagnose, and treat Ocampo after an officer told him he needed to go the ER. This delay is directly attributed to Corizon's failure to properly supervise unlicensed CMSs and LPNs who are allowed to practice medicine by diagnosing or prescribing medications.

Evidence of Dunning's termination was relevant to his state of mind for deliberate indifference. On January 10, 2017 Warden Krieger spoke to Dunning regarding an officer's Information Report about a mentally ill inmate. 2-ER-182-

84. Warden Krieger reported Dunning told him "he wasn't going to waste his time thinking about this piece of crap and he cares more about the shit his dog takes in the morning than this inmate." *Id.* "Jim stated 'that if he saw this inmate, he would shoot him.'" *Id.* This evidence is relevant to Dunning state of mind when he told Ocampo to "cowboy up" because it show his utter contempt for prisoners' medical needs and Corizon's failure to discipline Dunning instead of counseling him on "7/18/15" and on "5/3/16" which only empowered him to be deliberate indifferent to other prisoners. 2-ER-182.

**J. There was a genuine issue of material fact of whether Crowl was grossly negligent or reckless under the Idaho Tort Claims Act.**

Ocampo asserted a claim under the Idaho Tort Claims Act ("ITLA"), Idaho Code § 6-904B(5). 1-ER-047. The Court in granting summary judgment conflated the analysis and standards for establishing the negligence and Eighth Amendment claims. 1-ER-048-51. The Court equated "gross negligence" under Idaho Code § 6-904C(1) and "reckless conduct" under Idaho Code § 6-904C(2) with the subjective standard for deliberate indifference under the Eighth Amendment by requiring "Ocampo must show that he had a substantial risk of serious harm, that Crowl *knew* of this substantial risk, and that Crowl *intentionally* disregarded the risk." 1-ER-048. (citing *Gibson*, 290 F.3d at 1187 (emphasis in original). The Court observed "[i]f no duty was present, or if Ocampo fails to show deliberate

indifference as defined above, the negligence claim fails and Crowl is not liable." *Id.* The Court also held Crowl had immunity under Idaho Code § 6-904B(5). 1-ER-049.

The ITCA "is to be construed 'liberally' and 'with a view to accomplishing [its] aims and purposes, and attaining substantial justice…'" *Farber v. State*, 102 Idaho 398, 402, 630 P.2d 685, 689 (1981) (quoting *Keenan v. Price*, 68 Idaho 423, 438, 195 P.2d 662, 670 (1948)). The ITCA separately defines "gross negligence" and "reckless, willful and wanton conduct." The definition of gross negligence under Idaho Code § 6-904C(1) is not the same as deliberate indifference under the Eighth Amendment. Gross negligence entails a very high degree of negligence, whereas recklessness under Idaho Code § 6-904C(2) entails intentional disregard of a substantial risk of harm. *S. Griffin Const., Inc. v. City of Lewiston*, 135 Idaho 181, 189, 16 P.3d 278, 286 (2000). The gross negligence standard applies against government entities outside of the context of the meaning of deliberate indifference under the Eighth Amendment. *Id.* In *S. Griffin Const.* the Court held there was a genuine issue of material fact of whether the City was grossly negligent for failing to inspect a building prior to demolition. *Id.* at 190-91, 16 P.3d at 287-88. Construing the facts and inferences in favor of Ocampo, a genuine issue of a material fact exists as to whether Crowl was grossly negligent or reckless when he denied Ocampo's request for medical care and transport to a hospital.

Ocampo told his Unit Officer he needed to go to the hospital, was in an extreme amount of pain, and thought he was dying. 3-ER-574-75(81:21-25-82:3-4) & 3-ER-589(291:10-12). Ocampo informed the Officer that he had submitted HSRs but he was "not getting the treatment that I think that I need, and I'm getting worse. It's only getting worse." 3-ER-575(82:10-16). The Officer telephoned Crowl, who was at the prison. 3-ER-633 at ¶11. Ocampo heard the officer tell Crowl his face was badly swollen, and he was getting worse and he thought he was dying. 3-ER-575(83:6-8). Ocampo also heard the Officer tell Crowl he wanted relief from his pain, was unable to eat and sleep, and he needed to go to the hospital. 3-ER-575(84:6-8) & 3-ER-591(297:4-7). This information was sufficient notice of Ocampo's serious medical condition even for a non-medical person. 3-ER-593(309:11-13). Crowl was aware of the serious nature of Ocampo's condition because he had the Officer ask "'[i]f [Ocampo] was not incarcerated, would [he] have gone to the hospital,' and which [his] answer was, '[d]ays ago,'" 3-ER-578 (152:9-20); 3-ER-592(300:13-21 & 302:15-18). Ocampo was told Crowl had authority to approve transports to the hospital. 3-ER-592(303:21-25).

Crowl's response was to suggest he continue take ibuprofen which was not alleviating his pain. 3-ER-634-35 at ¶23 & ¶30. Crowl chose not to observe the visibly noticeable swelling that was obvious to the Officer. 3-ER-635 at ¶32. Crowl failed to contact the medical staff to request Ocampo be evaluated by a

APPELLANT'S BRIEF – Page 51

qualified healthcare provider. *Id*. at ¶31. Crowl determined he just wanted drugs and "there was no chance [Ocampo] was going to the hospital, and to go back to [his] bunk and wait for sick call." 3-ER-375(84:10-14).

Despite this evidence, the Court held "no reasonable jury could find Crowl's acts and omissions meet the rigorous standard of deliberate indifference to Ocampo's medical needs." 1-ER-047. The Court erred by finding Crowl was not deliberately indifferent because Ocampo testified that he did not believe Crowl intentionally caused him harm." "[T]he officials need not have intended any harm to befall the inmate; 'it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Edmo*, 935 F.3d at 793. In *Edmo* the Court recognized "[n]either the Supreme Court nor this court has ever required a plaintiff to show a 'sinister [prison official] with improper motives,' . . ." *Id.* Gross negligence does not require that Crowl intentionally tried to cause Ocampo harm. Ocampo testified: "Do I think he almost got me killed? Yes. I feel he was very, very, very, very irresponsible." 3-ER-594 (312:20-21). Trying to kill someone by failing to perform a duty is grossly negligent or reckless. This is a factual question that should be decided by the jury.

The Court found Crowl's suggestion that Ocampo take ibuprofen "demonstrates . . . his efforts to alleviate Ocampo's pain" not that he "was aware of, and indifferent to, any substantial risk of harming Ocampo." 1-ER-048-49.

However, "[t]he provision of some medical treatment, even extensive treatment over a period of years, does not immunize officials from the Eighth Amendment's requirements." *Edmo*, 935 F.3d at 793 (citing and quoting *Lopez*, 203 F.3d at 1132 (en banc) (explaining that "[a] prisoner need not prove that he was completely denied medical care" to make out an Eighth Amendment claim.")). The Court held officials are not immunized if they deny an evaluation for surgery because the inmate was provided a pain killer. *Id.* (quoting *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013)). There is a question of fact of whether Crowl was grossly negligent which the jury should decide. This Court should reverse the Court's finding that Crowl had immunity.

**K. There was a genuine issue of material fact of whether Crowl was deliberately indifferent.**

The Court held that assuming Crowl was not entitled to immunity he was not deliberately indifferent. 1-ER-049. The Court reasoned because Crowl did not actually see Ocampo he "did not have the ability to make emergency determinations based upon Ocampo's appearance and behavior . . . ." *Id.* (citing *Lolli*, 351 F.3d at 421). In *Lolli* the Court concluded there was evidence from which a jury could find "the officers knew of and were deliberately indifferent to this substantial risk of serious harm Lolli faced if not properly treated." *Lolli*, 351 F.3d at 420. The Court held deliberate indifference is shown if "'a fact finder may

conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* at 421 (quoting *Gibson*, 290 F.3d at 1197). The Court held when a prisoner makes explicit requests for medical care or has an "obviously sickly appearance" a jury could easily find that an officer "consciously disregarded a serious risk to Lolli's health." *Id.* There is no requirement that a prison official has to personally observe a prisoner. When "a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction." *Lolli*, 351F.3d at 419 (quoting *Gibson*, 290 F.3d at 1188). Ocampo's serious medical condition was obvious enough for the Officer to call Crowl to describe his condition and provide sufficient information for Crowl to determine Ocampo needed something more than Ibuprofen. Crowl knew Ocampo's condition was serious because he asked him if he would go to the hospital if he was not in prison.

The Court further held Ocampo was seen by medical staff who determined he was not experiencing a dental emergency despite the existence of the IDOC policy which required emergency dental health care for the "elimination of infection" and "relief from pain." 1-ER-049. Ocampo presented evidence that Crowl was informed he needed to go to the hospital to be examined by a doctor because he was in pain, could not eat or sleep and believed he was dying. Ocampo was never evaluated by a qualified provider who could diagnosis his condition.

Crowl had a separate duty under the IDOC policy to ensure Ocampo receive emergency dental care. 2-ER-257.

A plaintiff must satisfy an objective standard which requires a plaintiff to have a "serious medical need" and subjective standard which requires deliberate indifference. A prison official or prison medical provider subjectively acts with "deliberate indifference ... only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson*, 290 F.3d at 1187 (citation and internal quotation marks omitted). Deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*, 511 U.S. at 842).

"Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."). *Farmer*, 511 U.S. at 842. "[W]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . ." *Id.* Ocampo presented circumstantial evidence

from which a jury could conclude Crowl had knowledge of a substantial risk of serious harm and failed to act.

The Court held that Crowl was "entitled to rely on the medical professionals at the facility and their assessment of Ocampo. 1-ER-049 (citing *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013)). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the Court] need not defer to the judgment of prison doctors or administrators." *Edmo*, 935 F.3d at 786 (cleaned up). Crowl presented no evidence that he spoke to the medical staff or relied upon any assessment of Ocampo's deteriorating condition prior to or after refusing to transport him to a doctor or the hospital.[2]   Prison officials cannot rely on the opinions of medical staff if "a reasonable person would likely determine [the medical treatment] to be inferior," and the fact that an official is not medically trained will not shield that official from liability for deliberate indifference. *Snow*, 681 F.3d at 986 (overruled in part on other grounds *Peralta v. Dillard*, 681 F.3d 978 (9th Cir. 2014) (en banc)). In *Snow* the warden and associate warden argued there was no evidence that they "were personally involved in any of the medical treatment decisions." *Snow*, 681 F.3d at 989. They were only aware of the prisoner's "grievances regarding inappropriate medical treatment." *Id.* The Court

---

[2] The officer with authority to exempt McGee from wearing leg restraints without a medical order examined his legs and spoke with the doctor to determine the full extent of the medical issues. *McGee*, 721 F.3d at 483.

held that prison officials were not entitled to summary judgment because the prisoner had demonstrated the officials were aware of his serious medical condition. *Id.*

The Court found "[t]here is no clear evidence that Crowl knew of a substantial risk to Ocampo and was deliberately indifferent to that risk" 1-ER-050. The evidentiary standard on summary judgment is whether there are genuine issues of disputed facts and the Court must construe all facts in Ocampo's favor. The disputed facts do not have to be "clear" and the Court cannot weigh or determine what evidence it believes to be more creditable. "A fact-finder may infer subjective awareness from circumstantial evidence." *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (citing *Farmer,* 511 U.S. at 842). Crowl does not dispute he was aware of Ocampo's severe pain and requests for medical care. The Court's finding that Crowl did not have to act unless Ocampo was in "imminent danger or life-threaten harm" contradicts the IDOC's policy requiring emergency dental care and is not the standard for deliberate indifference. 1-ER-050.

The Court finding "that Crowl had no creditable information at his disposal (besides Ocampo's personal statements)" that required him to transport ignores what the Officer observed and told him and is based upon an improper credibility determination. *Id.* Crowl had "no creditable information" because he did not consult with the doctor or any medical staff. *See Sanzo v. Cox*, 2015 WL 9598270

at *9, (D. Nevada December 10, 2015) (The court denied summary judgment to officers who allege they brought the "kits to medical and brought nurses to Plaintiff's cell" after he begged for help due to a painful dental condition and abscesses that were the size of half of a golf ball.). Ocampo abscess went form the size of a baseball to a softball.

The delay in transporting Ocampo to a hospital resulted in the infliction of unnecessary pain and substantial harm. Crowl's contention that prison officials have no authority and are not authorized to act or interfere to ensure Ocampo did not suffer and die while waiting for medical care is a "textbook example of the state of mind required to violate the Eighth Amendment" and should be reversed. *Snow*, 681 F.3d at 990.

## L.  The District Court abused its discretion by weighing the conversation between Ocampo, the officer and Crowl.

The Court ruled the conversation between Ocampo and officer was admissible. 1-ER-052. The Court ruled Ocampo's statements putting Crowl on notice of his medical condition were not hearsay. *Id.* The Court then ruled, under the agency relationship hearsay exception in Fed.R.Evid. 801(d)(2)(D), "the statements made by Crowl and relayed by the officer are not hearsay and are admissible." 1-ER-054. The Court also ruled [a]ny statements Ocampo witnessed the officer say to Crowl" were admissible. *Id.* The Court held it "has given such

statements the weight it deems appropriate." *Id.* The Court cannot weigh evidence based upon the perceived creditability of Ocampo's recollection of what the Officer told him or what the Officer told him what Crowl told her. It is not clear how the Court weigh the evidence, in Ocampo's favor or against him, for purposes of summary judgment.

The conversation made Crowl aware of Ocampo's serious medical condition. Crowl was informed by Ocampo of his need to go to a hospital because of his pain and swelling, he could not eat or sleep, and he would go if not in prison. Crowl failed to act even though he knew of and was deliberately indifferent to this substantial risk of serious harm. Crowl delayed Ocampo from being transported to the hospital. Crowl's inaction resulted in further significant injury and the unnecessary and wanton infliction of pain. The Court erred by not considering Ocampo's evidence as true for purposes of summary judgment and not allowing the jury to weigh the conflicting evidence.

## VII. CONCLUSION

This Court should reverse the grant of summary judgment, the weighing of Nurse Fabello's opinions based upon so-calling correctional nursing standards, the exclusion of Dr. Ludwig's expert report, and the evidentiary ruling excluding and weighing evidence for purposes of summary judgment.

Appellant is unaware of any related or pending cases.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,814 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

RESPECTFULLY SUBMITTED this 25th day of March, 2021.

Howard A. Belodoff_____
/s/Howard A. Belodoff

Rebecca A. Rainey_____
/s/Rebecca A. Rainey
Attorneys for Appellant

CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of March, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Howard A. Belodoff
/s/Howard A. Belodoff
Attorney for Appellant